UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL BARRIOS,<br><br>    Petitioner,<br><br>  v.<br><br>STATE OF CALIFORNIA PAROLE DEPARTMENT and ATTORNEY GENERAL OF STATE OF CALIFORNIA,<br><br>    Respondents.<br>                                 / | No. C 05-1294 SI (pr)<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |

## INTRODUCTION

This matter is now before the court for consideration of the merits of Michael Barrios' pro se petition for writ of habeas corpus concerning his 1999 conviction in the Santa Clara County Superior Court. For the reasons discussed below, the petition will be denied.

## BACKGROUND

A.   <u>The Crime</u>

The California Court of Appeal, Sixth Appellate District summarized the facts of the case as follows:

> Defendant was Amy Doe's stepfather. When Amy was nine years old, she lived in a two-bedroom apartment with defendant, her mother, Connie, and her stepsister, Michelle, who was five years younger than Amy. Amy and Michelle shared a bedroom. Defendant's parents lived in the apartment next door. Amy's other stepsister, Stephanie, lived with defendant's parents. Connie an defendant were the parents of both Stephanie and Michelle.

When Amy was nine, Connie told her that defendant was not her biological father. According to Amy, defendant then began treating her differently. He was not as close to her and became angry with her more easily. He yelled at her, calling her an "idiot" and a "stupid bitch." He hit her, punching her in the face and in the stomach. Amy also witnessed defendant being violent towards others. He hit his father and the police were called. He also hit Connie.

When Amy was nine, Connie was diagnosed with multiple sclerosis, which affects the central nervous system. Connie gradually lost the ability to feed, bathe, and dress herself. Until Amy left home at age 15, she helped Connie with these functions. She was also responsible for giving Connie injections. In addition to caring for Connie, Amy took care of Michelle.

Amy slept on the top bunk in her room. When she was about nine or ten years old, defendant began entering her bedroom between midnight and 4:00 a.m. He would wake her up and tell her that he needed to talk to her. Michelle, who was a very sound sleeper, did not wake up when defendant entered the bedroom. Defendant would then take Amy into the kitchen. Defendant talked to Amy as he sat at the table. He would tell her that she was treating him differently since she learned he was not her father, and that she was mean to her mother. He told her that she was the oldest and had to take responsibility for her sisters and be the woman of the house because her mother was sick.

After about a month, defendant went through the same ritual, but then told Amy to take her shirt off. When she refused, he said, "Don't make me beat your ass." Amy complied, and defendant looked at her. A few weeks later, defendant repeated the ritual, but then he began demanding that she take off her pants and underwear. About two or three months later, he began rubbing her breasts and the outside of her vaginal area. He told her not to look at him when he did this. These incidents occurred about three to four times a week. During the incidents, Amy noticed that defendant acted irritated and angry. His face looked unusual – his mouth drooped as if he were frowning and he squinted his eyes.

Defendant's conduct escalated. When Amy was about 14, defendant made her undress, undressed himself, got on top of her on the living room floor, and rubbed his penis against her vaginal area. Defendant told Amy that if she told anyone, he would "beat [her] ass" or kill her.

Though Amy told Connie that she was being molested, Connie did not protect her. When Amy was in seventh grade, she was in her parents' bedroom one evening. Defendant made Amy take off her clothes, and told her, "We sleep in the raw or we don't sleep at all." Defendant, Connie, and Amy removed their clothing and got in bed. Defendant did not touch Amy. Amy left the room when she heard defendant snoring.

Sometimes Amy would leave through her bedroom window to avoid being molested. Usually she went to her grandparents' apartment, but she also went to her friend's house. When Amy was in eight or ninth grade, she told her grandmother, Elida Barrios, that defendant was molesting her. Elida began crying and told Amy that she could stay with her. When Elida confronted defendant about the molestation, defendant said that Amy was lying. Amy stayed at her grandparents' apartment for a few months. She returned when her parents agreed to put a lock on her bedroom door. However, defendant would not allow her to use the lock, because he claimed that Michelle needed to use the bathroom and she could not unlock the door. Defendant continued to molest Amy.

When Amy was in the eighth grade, she and defendant were in a car at John Mise Park. Defendant pulled out a mirror with a white powdery substance on it and a cut off straw, and he inhaled the substance. He then had the same "frowny face" that she had seen before when he molested her. Later, defendant lined up more of the powdery substance, handed Amy a straw, held the mirror to her face, and told her to "do this." Amy said that she did not know how to do it, and defendant told her, "You put the straw to your nose and you inhale this." Amy said that she did not want to do it. Defendant said that he would have "beat [her] ass" if she did.

About 15 minutes later, defendant drove to Strawberry Square and parked the car. He told Amy that she did not treat him with respect and she was mean to her mother. He told her that he wanted her to "giv[e] him head." When she said that she did not know how, he said, "You put your mouth around my penis and you move up and down." He told her that if she did not comply he would put her in the trunk of the car. She did it for a short time, but then saw some headlights. She saw that it was the police.

Amy testified that Connie also had a drug problem. Amy saw items in the apartment that she associated with drug use, such as razor blades, mirrors, cut-off pens, plastic baggies, and white powdery substances on a mirror and razor blade. Occasionally Connie would leave the house to look for drugs, and Amy would try to find her. Defendant's parents would argue with him about his drug use.

In May 1994, defendant yelled at Amy because she had not ironed his shirt properly. When he left the room, Amy said, "Well, if you don't like the way I'm doing it, then do it yourself." After Michelle reported Amy's comment to defendant, defendant hit Amy with a broom. Since Amy had bruises, a teacher reported the incident to the police. Amy was then taken to a children's shelter.

Amy did not like the shelter. She did not like the lack of privacy and the school was not good. About a week later, she was allowed to return home. She believed that defendant would be scared and leave her alone because the police had been involved.

When Amy returned home, defendant ignored her. However, on the second night after her return, defendant's friend played a practical joke on him. Defendant was taking a shower, and the friend told Amy to ask him to open the bathroom door. When defendant opened the door, the friend poured cold water on him. After the friend left, defendant blamed Amy. He made her undress and get in the shower. He then poured could water on her.

Amy realized that defendant was not scared and she ran away from home the following day. On June 7, 1994, she began living with Richard and Barbara Marcotti, who became her foster parents. Susan Tait became Amy's social worker. In September 1994, Amy reported defendant's conduct to Tait. She later told Barbara about it as well.

Officer Janet Cusimano had extensive training and experience regarding controlled substances. She testified that cocaine is a central nervous system stimulant. A common way to ingest it is by snorting it into the nose. Individuals commonly use a mirror to line up the drug and razor blades to cut the drug. Cocaine use can cause a person to become angry or irritable.

Cusimano testified that cocaine could change a person's facial expression. An individual who lived with someone who used cocaine might notice facial expressions or other body language indicating recent use, though a police officer might not be aware of such signs. A common symptom of cocaine use is extremely dilated pupils. Since dilated

pupils allow light into the eye, a person might react by squinting. According to Cusimano, it was consistent with chronic cocaine use for a person to be awake between midnight and 4:00 a.m. and sleep all day. Cocaine is a stimulant that keeps a person awake, and when the person comes down from the drug, they "crash."

Tait was a social worker in the sexual abuse unit of the Department of Social Services in 1994 and 1995. On September 7, 1994, she visited Amy at her foster parents' house. When Amy reported the sexual abuse, she was crying. Amy told Tait that she had told Elida.

On September 14, 1994, Tait met with defendant, Connie, and Elida. Tait tried to talk to Connie, but defendant and Elida prevented her from answering a lot of questions. Defendant indicated that he was going to leave Connie when they were able to obtain in-home support for her. Defendant claimed that he was forced into marrying Connie, because she was pregnant and he felt sorry for Amy. Defendant and his mother claimed that Connie would not take a bath and did not think about the girls. They also claimed that all she wanted to do was smoke cigarettes and marijuana. Tait asked Connie what she would like to happen, and Connie asked, "How do you commit suicide?" Defendant commented to the effect, "I'm tired of hearing this shit," and left.

On September 26, 1994, Tait spoke to Connie on the telephone. Connie said that defendant was beating her and it was getting really bad. Tait met with Connie and Amy on October 2, 1994. Connie was very sick. She was in a wheelchair and her speech was slurred. Though Connie said that she had memory lapses, she remembered what Tait had talked to her about on previous occasions. At one point, Amy said to Connie, "You know, Michael used to make me take my clothes off." Connie responded that Amy was a baby or a little girl at the time. Amy said that she was not a baby at nine, or twelve, or fifteen. Connie began crying and changed the subject. During the meeting, Tait observed that Amy was in the parental role. She asked Connie if she had eaten and taken her medicine. She also asked how she was doing and whether defendant was still using drugs and hitting her.

On October 14, 1994, Tait had a telephone conversation with Elida. Elida was angry and maintained that Amy was lying. Since Elida had a telephone and Connie did not, all communication went through her home. She refused to allow Amy to speak to Connie on her birthday. Elida expressed anger with Amy, Tait, and Connie. She was not cooperative.

On December 9, 1994, defendant called Tait and left a message that they did not know "any Amy." He also said, "Please don't call here bothering us again."

According to Tait, Connie would not participate in any counseling to get Amy back. Connie said that Amy would be safer outside the home, and that she was an outcast.

In February 1995, Detective Mary Litel taped a telephone call with Connie. Connie acknowledged that she had known that defendant was sexually molesting Amy. She also remembered that defendant hit Amy.

On March 8, 1995, Litel taped a second telephone interview with Connie. Connie stated that defendant had a drug problem and took "crank." Connie said that Amy was in fifth or sixth grade when she told Connie that defendant was molesting her. Connie believed Amy. Connie also stated that defendant hit Amy a lot. According to Connie,

other members of defendant's family were mean to Amy because she was "not theirs." Cal. Ct. App. Opinion, pp. 4-5.

B. <u>Case History</u>

In 1995 Barrios was charged with lewd and lascivious conduct upon a child under 14 years of age, lewd and lascivious conduct upon a child 14 or older, and furnishing a minor with cocaine or methamphetamine. See Cal. Penal Code §§ 288(a), 288(c); Cal. Health & Safety Code § 11353.

Barrios initially pled guilty to the two counts of lewd and lascivious conduct and was sentenced to three years in prison. Barrios later was permitted to withdraw his plea because he had been misadvised of the maximum potential sentence.

A jury trial began on May 26, 1998, and two days later, a mistrial was declared after a witness referred to information which had been ruled inadmissible.

On September 13, 1999, a new jury trial began. Barrios was found guilty of lewd and lascivious conduct upon a child under 14 years of age, lewd and lascivious conduct upon a child 14 or older, and furnishing a minor with cocaine. He later was sentenced to a ten-year, eight-month prison term.

Barrios filed an appeal and a petition for writ of habeas corpus in the California Court of Appeal. The court affirmed the judgment of conviction, but issued an order to show cause with respect to the petition for writ of habeas corpus on the claim that counsel rendered ineffective assistance by allegedly failing to inform Barrios of his right to testify. The California Supreme Court denied Barrios' petition for review. The Santa Clara County Superior Court held an evidentiary hearing on Barrios' habeas claim and denied the petition for writ of habeas corpus.

Barrios' later state habeas petitions were denied by the California Court of Appeal and the California Supreme Court. Barrios then filed this federal habeas petition.

**JURISDICTION AND VENUE**

This court has subject matter jurisdiction over Barrios' habeas action for relief under 28 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because the challenged conviction occurred in Santa Clara County, California, within this judicial district. 28 U.S.C. § 84, 2241(d).

**EXHAUSTION**

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. See 28 U.S.C. § 2254(b), (c). State judicial remedies have been exhausted for the claims presented in Barrios' petition.

**STANDARD OF REVIEW**

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

**DISCUSSION**

Barrios raises two ineffective assistance of counsel claims. He claims that he was denied effective assistance of counsel when his counsel (1) failed to call him to testify on his own behalf and (2) failed to call other witnesses for the defense.

In order to prevail on an ineffective assistance of counsel claim, Barrios must establish two things. First, he must show that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms. Strickland v. Washington, 466 U.S. 668, 687-88 (1984). In evaluating counsel's performance, the court must presume "that counsel's conduct falls within the wide range of reasonable professional assistance . . ." Id. at 689. Second, Barrios must establish that he was prejudiced by counsel's deficient performance, i.e., show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Id.

A.   Failure to Call Petitioner as Witness

Barrios contends that his trial counsel, Brenda Malloy, was ineffective in that she failed to call him to testify as a witness. He contends that Malloy led him to believe he would be testifying and then, unexpectedly and without consultation, announced that the defense rested immediately after the prosecution had rested.

The Santa Clara County Superior Court held an evidentiary hearing on the claim that Barrios had been denied effective assistance of counsel because counsel failed to advise him that he was the one who made the choice whether he would testify and failed to call him to testify. The judge from Barrios' trial presided over the evidentiary hearing. Barrios, Malloy, and the prosecutor testified at the hearing.

Barrios testified first at the evidentiary hearing. He testified that he had discussed testifying with Malloy but Malloy did not tell him that it was his personal choice whether to testify. Malloy also did not tell him that he should not testify and did not tell him that he would

7

1 be cross-examined and impeached with evidence of an allegation that he had raped his wife.
2 Barrios claimed to have been surprised when Malloy announced that the defense rested without
3 allowing him to testify and without calling any other witnesses. He acknowledged that she did
4 tell him "she was going to pull the chair from underneath the district attorney's feet," but Barrios
5 didn't understand what was happening and didn't realize she was going to announce that the
6 defense rested.   Resp. Exh. 11 at RT 10, 21.

7       Malloy testified next. According to her, she had numerous discussions with Barrios about
8 the case and she informed him that there were many contingency plans depending on the court's
9 rulings.  She had discussed with Barrios the possibility of him testifying, as well as the
10 possibility that he would be impeached with evidence of his alleged rape of his wife, domestic
11 violence incidents, and child neglect incidents. Malloy testified that, after the prosecution rested,
12 she leaned over and had a lengthy whispered conversation with Barrios in which they discussed
13 the advantages and disadvantages of him testifying and of resting without presenting any
14 evidence. They agreed that Barrios would not testify. Barrios never told her he wanted to
15 testify. He expressed his trust in her and agreed it would be proper for the defense to rest.

16       JoAnne McCracken, the deputy district attorney who prosecuted Barrios, also testified
17 at the evidentiary hearing. She recalled that after the prosecution rested, Barrios and Malloy
18 were crouched down and whispering for a long time in a discussion rather than an argument.
19 After that discussion, Malloy stood up and announced that the defense rested. McCracken
20 recalled that Barrios and Malloy appeared to have an amicable relationship before trial, during
21 trial and even throughout the jury deliberations.

22       After hearing the evidence, the state court denied the petition for writ of habeas corpus,
23 finding that trial counsel did not render ineffective assistance. Resp. Exh. 12, p. 1. "The
24 defendant was informed of his right to testify by his attorney and counsel would have allowed
25 him to testify had he wanted to ignore her advice and take the witness stand. He was aware that
26 the choice was his and was advised of that by his attorney. Further, the defendant agreed with
27 his attorney and decided not to testify, and chose to submit the case to the jury on the state of the
28

evidence. This decision was made after a discussion with his attorney at counsel table and was a tactical decision." Id.[1]

This court is not free to ignore the state court's factual findings. "[A] determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Barrios has not rebutted the correctness of any of the factual findings made after the evidentiary hearing.

Barrios also has not shown that the state court's adjudication of his claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); see Taylor v. Maddox, 366 F.3d 992, 999-1000 (9th Cir. 2004). The state habeas court expressly found that Malloy had numerous discussions with Barrios about the case, that Barrios knew of his right to testify, and that Malloy and Barrios consulted and agreed to rest without calling any witnesses. The state

---

[1] After the Santa Clara County Superior Court denied the petition for writ of habeas corpus, Barrios filed a new petition for writ of habeas corpus in the California Court of Appeal. See Resp. Exh. 13. The California Court of Appeal denied the petition "without prejudice to the filing of an original habeas petition, raising the claim of ineffective assistance of counsel based on the denial of defendant's right to testify at trial and accompanied by the appropriate record. (See In re Resendiz (2001) 25 Cal. 4th 230, 249; see also People v. Duvall (1995) 9 Cal.4th 464, 474.)" Resp. Exh. 14. The Resendiz case, at the place cited, stands for the proposition that an appellate court considering an original habeas petition is not bound by the factual determinations made by the superior court following an evidentiary hearing and instead independently evaluates the evidence and makes its own factual determinations. The Duvall case, at the place cited, stands for the proposition that the habeas petitioner must submit reasonably available documentary evidence supporting the claim, including pertinent portions of trial transcripts and affidavits or declarations. This court interprets the citations and language of the California Court of Appeal's short order to be notice to Barrios that he could raise his ineffective assistance of counsel claim in a habeas petition accompanied by the transcript of the evidentiary hearing and other evidence, and that the California Court of Appeal would look at the same evidence as the superior court but would independently evaluate the evidence and make its own factual determinations.

Barrios did file further habeas petitions after the California Court of Appeal's procedural rejection. He filed another habeas petition in the California Court of Appeal and another one in the California Supreme Court; both were rejected in unexplained orders. See Resp. Exhs. 15-18. The net result of all of this is that the last reasoned decision from a state court is the decision of the Santa Clara County Superior Court's rejection of the habeas petition. See Resp. Exh. 12. That decision is the one this court evaluates under 28 U.S.C. § 2254(d) and (e).

1 court's determination of the facts was reasonable in light of the evidence presented.  The state
2 habeas court's decision reflected a reasonable acceptance of Malloy's version rather than Barrios'
3 version of what had transpired after the prosecution rested, especially since the prosecutor also
4 testified that she observed (but did not hear the content of) a lengthy whispered conversation that
5 occurred between Malloy and Barrios in the courtroom after the prosecution rested and just
6 before the defense rested.

7 The state habeas court's rejection of Barrios' claim for ineffective assistance of counsel
8 also was not contrary to or an unreasonable application of clearly established federal law as set
9 out by the U.S. Supreme Court in Strickland v. Washington.  As noted earlier, in order to prevail
10 on an ineffective assistance of counsel claim, Barrios must establish that (1) Malloy's
11 performance fell below an objective standard of reasonableness, and (2) there is a reasonable
12 probability that, but for her unprofessional errors, the result of the proceeding would have been
13 different.  See Strickland, 466 U.S. at 687-88.

14 Barrios has not established that Malloy's performance was deficient.  Insofar as he
15 contends that counsel was deficient because she did not inform him of his right to testify before
16 announcing that the defense rested, Barrios's claim must be rejected because the state habeas
17 court reasonably determined that Malloy had informed him.  This court accepts the state's
18 determination that Barrios knew of his right to testify and agreed with Malloy that the defense
19 would rest without calling him as a witness. Malloy had reasonable tactical reasons for advising
20 Barrios not to testify, i.e., the existence of very damaging impeachment evidence.  There was
21 evidence that he had raped his wife, Connie, and with evidence of police reports of domestic
22 violence and child neglect.  Although the spousal rape had been ruled inadmissible, that ruling
23 was only with regard to presenting the evidence in connection with Connie's testimony and did
24 not bar use of the evidence for impeachment if Barrios testified.   Similarly, the trial court had
25 ruled in limine that the victim could only testify to Barrios' drug usage that she had actually
26 observed; if Barrios testified, that limit on the drug evidence was not in place and the court
27 indicated in limine it would not take much to open the door to the introduction of evidence of
28

1  Barrios' drug usage. The prosecutor confirmed at the evidentiary hearing that had Barrios
2  testified, she would have questioned him about drug use, the spousal rape, and prior acts of
3  moral turpitude. Barrios was a very impeachable witness -- he had a history of drug use, there
4  was evidence that he had previously raped his wife, and there were police reports of domestic
5  violence and child neglect by him. Some of that evidence would not be before the jury unless
6  Barrios testified. The state court's conclusion that Malloy did not provide ineffective assistant
7  was not an unreasonable application of or contrary to Strickland. Barrios is not entitled to the
8  writ on this claim.

B.     Failure to Call Other Witnesses

Barrios claims that he was deprived of the effective assistance of counsel because Malloy failed to call his mother, his wife, and his daughters to testify for the defense. (He claimed in state court that counsel should have called other persons to testify, but has not repeated that part of his claim in his federal petition.)

The California Court of Appeal rejected Barrios' claim that counsel was ineffective. The appellate court found that the record indicated that not calling the witnesses was a reasonable tactical decision. Cal. Ct. App. Opinion, pp. 17-18.

> Elida was clearly hostile toward Amy. Moreover, her testimony caused the mistrial in the first trial and the trial court believed that she was "trying to sink this case." As defendant's mother, she had a strong bias and thus counsel could have had a tactical reason for not calling her. Connie's testimony would also have been problematic, since she had made statements to the social worker, her two sisters-in-law, and the police that defendant had molested Amy. Connie was extremely ill at the time of trial and dependent on the Barrios family for care, thus the prosecutor would have been able to show her present bias and impeach her credibility. Regarding [Barrios' daughters] Michelle and Stephanie, Elida had cared for them during the eight previous years and they were defendant's biological daughters. Thus, they were also influenced by Elida and biased in defendant's favor. Counsel could reasonably conclude that they would not be credible.

Cal. Ct. App. Opinion, p. 18.

Counsel's failure to present probative, noncumulative evidence in support of a chosen defense strategy is deficient performance absent a reasonable tactical justification. See Alcala v. Woodford, 334 F.3d 862, 870-71 (9th Cir. 2003). To establish prejudice caused by the failure

11

to call a witness, a petitioner must show that the available witness' testimony would have created a reasonable probability that the jury would have reached a verdict more favorable to the petitioner. See id. at 872-73.

The deficient performance prong of Strickland is not satisfied here. This is not a case where defense counsel never bothered to contact witnesses. Malloy had investigated the case and had witnesses in the courthouse ready to testify if she wanted to call them. She had interviewed and considered presenting as witnesses the people who Barrios complains were not called. "Few decisions a lawyer makes draw so heavily on professional judgment as whether or not to proffer a witness at trial. A witness's testimony consists not only of the words he speaks or the story he tells, but also of his demeanor and reputation. A witness who appears shifty or biased and testifies to X may persuade the jury that not-X is true, and along the way cast doubt on every other piece of evidence proffered by the lawyer who puts him on the stand." Lord v. Wood, 184 F.3d 1083, 1095 (9th Cir. 1999).

All of the witnesses Barrios identifies in his federal petition were related to him. "As a matter of trial strategy, counsel could well decide not to call family members as witnesses because family members can be easily impeached for bias." Bergmann v. McCaughtry, 65 F.3d 1372, 1380 (7th Cir. 1995).

Barrios' wife, Connie, would not have been a favorable witness for the defense. Obviously it would have been unhelpful if Connie testified that Barrios molested Amy. But even if, as expected, Connie denied that Barrios molested Amy, there was abundant evidence of her prior statements that Barrios had molested her. The prosecution planned to have Connie's sisters-in-law testify that throughout the years Connie had talked about Barrios molesting Amy. These statements contemporaneous with the ongoing molestations would have been particularly damaging to the defense and bolstered the believability of the prosecution's case. Connie also could have been impeached with evidence that she admitted to social worker Susan Tait that Barrios beat her (Connie) and that she had not reported some of the things she had seen happen with Amy several years earlier. Additionally, the prosecutor could have shown bias based on

1  Connie's dependency on the Barrios family for care due to her serious illness.

2  Barrios's mother, Elida, also was very impeachable. The prosecution had already
3  presented some evidence about Elida Barrios' hostility to the victim. Bias that would be
4  expected from a defendant's mother would have diminished her credibility. In light of the high
5  possibility of impeachment, Malloy made a reasonable tactical decision to not call Elida to
6  testify. Additionally, Elida was the person who caused the earlier mistrial when she mentioned
7  that Barrios had already been imprisoned for this case. The trial judge thought Elida was "trying
8  to sink this case," and indicated his intent to strongly admonish her not to mention the improper
9  matter again. RT 351.

10  Malloy's decision to not call Barrios' daughters, Michelle and Stephanie, also was
11  reasonable. They had been under Elida's care for eight years and were Barrios' natural daughters
12  (as opposed to the victim, who was his step-daughter). They would have been impeachable as
13  having been influenced by their grandmother's views of the victim.

14  Malloy reasonably could have concluded that the witnesses' testimony would have been
15  more harmful than helpful to Barrios and that their bias would have been evident to the jury.
16  Although each witness may have been able to provide a small amount of helpful testimony, the
17  helpful morsels cannot be examined in a vacuum. Malloy's decision not to call the witnesses
18  was a reasonable strategic choice in light of the totality of the anticipated testimony and
19  impeachment. Moreover, Malloy's decision in this case to not call these witnesses was part of
20  her larger strategic decision to rest without calling any witnesses. As she had advised her client
21  before resting, she "felt the evidence was in the best state that it was going to be in in this trial
22  given the in limine rulings." Resp. Exh. 10, RT 39. By not putting on any witnesses, defense
23  counsel prevented the prosecutor from offering any more evidence to bolster the case against
24  Barrios (such as the testimony of Connie's sisters-in-law). Even the prosecutor saw Malloy's
25  decision as both strategic and reasonable. See RT 561-64. As Malloy had hoped, the decision
26  to rest without calling witnesses had come as a surprise to the prosecutor and disrupted her some
27  of her plans. See id. Under the circumstances, counsel's decision not to call the witnesses did
28

not amount to deficient performance.

For the same basic reasons that the decision not to call these witnesses was not deficient performance, it did not result in any prejudice. There is no reasonable probability that, had Malloy called these persons to testify for the defense, the outcome of the proceedings would have been different. As previously mentioned, all of the witnesses had strong biases and therefore were easily impeachable. Barrios is not entitled to habeas relief based on this claim.

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED. The clerk shall close the file.

IT IS SO ORDERED.

DATED: March 1, 2006

SUSAN ILLSTON
United States District Judge